IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SHAWN Y. FITZGERALD,<br><br>               Plaintiff,<br><br>    v.<br><br>SHORE MEMORIAL HOSPITAL d/b/a<br>SHORE MEDICAL CENTER<br><br>           Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 12-6221 (JBS/AMD)<br><br>**OPINION** |

APPEARANCES:

Richard Steven Swartz, Esq.
SWARTZ LEGAL LLC
1101 Kings Highway North, Suite 402
Cherry Hill, NJ 08034
    -and-
Daniel Ari Horowitz, Esq.
SWARTZ SWIDLER LLC
Society Hill Office Park
1101 North Kings Highway, Suite 402
Cherry Hill, NJ 08034
    Attorneys for the Plaintiff

Richard J. Defortuna, Esq.
Donna M. Candelora, Esq.
PAISNER LITVIN LLC
30 Rock Hill Road
Bala Cynwyd, PA 19004
    Attorneys for the Defendant

**SIMANDLE**, Chief Judge:

## I.   INTRODUCTION

The Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601,

allows employees to take up to twelve weeks of medical leave in

a year without losing their jobs and prohibits employers from

interfering with an employee's FMLA rights. In this case,
Plaintiff Shawn Fitzgerald, who was employed by Defendant Shore
Memorial Hospital as a nurse, alleges that Defendant violated
her rights under the FMLA and under the New Jersey Law Against
Discrimination ("NJLAD") when it terminated her on April 22,
2011, five days after she missed work to see a doctor about her
heart problems. In addition, Plaintiff asserts FMLA claims
against Defendant for disciplining Plaintiff in 2009 for an
absence covered by the FMLA; denying Plaintiff leave in August
2010 to visit a sick aunt; closely "tracking" Plaintiff's
attendance upon her return from FMLA leave in September 2010;
and requiring Plaintiff to provide a doctor's note each time
Plaintiff took an FMLA-related absence. Lastly, Plaintiff
asserts that she was discriminated against on the basis of race
and subject to a hostile work environment, in violation of the
NJLAD.

Presently before the Court is Defendant Shore Memorial
Hospital's motion for summary judgment, which challenges all
Counts of Plaintiff's complaint. [Docket Item 23.] For the
reasons set forth below, the Court will deny Defendant's motion
with respect to the disability discrimination and retaliation
claims arising out of Plaintiff's termination. The Court will
grant Defendant's motion with respect to all other claims.

## II.   BACKGROUND

### A. The Family Medical Leave Act

Congress passed the FMLA in 1993 in an attempt "to balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). The FMLA allows "employees to take reasonable leave for medical reasons." Id. § 2601(b)(2). However, it also requires that all such leave be taken "in a manner that accommodates the legitimate interests of employers," Id. § 2601(b)(3).

FMLA-eligible employees are allowed to take twelve weeks of leave during any twelve-month period. Leave is covered under the FMLA if an employee has a "serious health condition that makes the employee unable to perform the functions" of his or her job. Id. § 2612(a)(1)(D). Employees are also eligible for leave in order to care for a parent of the employee if the parent has a serious health condition. Id. § 2612(a)(1)(C). Following this period of leave, an employee is entitled to be restored to his or her original position or its equivalent. Id. § 2614(a)(1).

The FMLA allows for "intermittent leave," defined as "leave taken in separate blocks of time due to a single qualifying reason," when medically necessary. 29 C.F.R. § 825.202(a). Federal regulations note that intermittent leave "may include leave of periods from an hour or more to several weeks." Id. §

3

825.202(b)(1). Examples of intermittent leave may include leave taken for medical appointments or for regular medical treatments. Id.

Under the FMLA, employers may not deny leave to employees who qualify, nor may they retaliate against employees who exercise their rights under the FMLA.

**B. Summary Judgment Record**

The Court begins with the summary judgment record.

Plaintiff Shawn Fitzgerald is an African American nurse who was employed by Defendant Shore Memorial Hospital ("Shore") from 2005 to April 2011. (Def. Statement of Material Facts ("SMF") ¶ 2.) She suffers from hypertension and Wolff-Parkinson-White Syndrome ("WPW"), a congenital heart condition which symptoms include episodes of rapid heart rate. (Dec. 9, 2013 Fitzgerald Dep. [Docket Item 30] 5:18-24; Pl. Statement of Material Facts ("Counter SMF") ¶ 41-43). Prior to her employment with Defendant, Plaintiff worked for 18 years as a licensed practical nurse.

1. Defendant's Time and Attendance Guideline

Shore's Time and Attendance Guideline ("Guideline") applies to all employees, including nurses. (Time and Attendance Guideline, Def. Ex. 20 [Docket Item 23-5]; SMF ¶ 28.) Plaintiff testified at deposition that she was familiar with the

4

hospital's attendance policy and understood how it worked.

According to the Guideline, employees who violate the attendance policies will accrue attendance infractions, or "incidents," over a rolling 12-month period, measuring back from the date of the most recent incident. An employee who accumulates four incidents within 12 months receives verbal counseling. If she continues to accumulate infractions, she receives written counseling for each incident after the fifth, up to eight incidents. An employee who receives nine attendance infractions within 12 months, "resulting in a counseling that includes the verbal, the first, second and third written counseling," is subject to termination. (Time and Attendance Guideline 3-4.) (Id. at 3-4.)

Incidents may be accumulated in several ways. Failure to report to work and failure to contact one's supervisor before the start of one's shift is a "no call/no show" and counts as an incident. Two "events of lateness" or leaving early qualifies as a single incident. Up to three consecutive days of "unscheduled absence" defined as an absence without prior approval from one's supervisor, also counts as a single incident, "unless a physician's note is supplied." (Id. at 1-2.)

The Guideline defines an "absence" as "[a]ny time the employee is not available, regardless of reason, to report to

their scheduled work shift." An employee who has approval to
take leave under the FMLA qualifies for a "scheduled absence"
"as long as proper notification and verification is provided to
their manager." (Id. at 1-2.)

    2. Defendant's FMLA Protocol

    Decisions to approve or reject FMLA leave requests were
made by the director of benefits and employee health at Shore,
Kathleen Nunzi. (Nunzi Dep., Pl. Ex. I [Docket Item 26-13]
12:23-13:8.) Nunzi sometimes made the determination after
consulting with others, including individuals in Human Resources
who gathered the employee documents. (Id. 13:8-23.)

    The FMLA allows employees to care for parents who have a
serious health condition. Nunzi stated that she would approve
FMLA leave only for a biological or adopted parent. (Id. 30:3-
9.) Margaret Griggs, an employee in Human Resources who
processes FMLA requests, testified that if an employee was
requesting leave to take care of someone who was not a parent,
the employee would need to provide some additional proof that
the family member was covered under the FMLA. (Griggs Dep., Pl.
Ex. J [Docket Item 26-14] 20:21-22:24.)

    According to Griggs and Shore's vice president of human
resources, Alan Beatty, Shore typically asked employees who were
on intermittent FMLA leave to supply a doctor's note if they

6

went to the doctor but did not require it if the employee did
not visit a doctor. (Beatty Dep., Pl. Ex. G [Docket Item 26-11]
79:2-8; Griggs Dep., Pl. Ex. J [Docket Item 26-14] 32:14-33:1.)

    3. Plaintiff's Employment at Shore

    On March 22, 2008, Defendant approved Plaintiff's request
for a one-year period of intermittent FMLA leave for issues
related to her WPW Syndrome and hypertension. (SMF ¶ 52; Dec. 19
Fitzgerald Dep. 19:15-19.) In the leave approval section of the
form, it stated, "Please submit Dr's note to Human Resources for
each incidence of illness related to leave." (Mar. 2007 Leave
Request, Def. Ex. 27 [Docket Item 23-6].) Plaintiff's leave
period expired March 21, 2009, and in September 2008, Plaintiff
applied for and was approved for another one-year period of
intermittent FMLA leave for the same medical conditions. (SMF
¶58; Dec. 19 Fitzgerald Dep. 19:20-24.) This form did not ask
her to submit a doctor's note for each day she took leave.
Plaintiff's intermittent leave period expired September 9, 2009.
(Sept. 2008 Leave Request, Def. Ex. 30 [Docket Item 23-6]).

    Between September and December of 2009, Plaintiff accrued
three incidents of unexcused absence and was issued oral
counseling. (SMF ¶ 70; Dec. 2009 Counseling Notice, Def. Ex.
38.) The counseling notice indicated that she had also
accumulated an unexcused absence for March 6-7 of that year,

7

while Plaintiff was on approved FMLA leave. Plaintiff contends that these absences were covered under her approved intermittent FMLA leave period, which expired March 22, 2009. (Counter SMF ¶ 59.)

Plaintiff did not reapply for intermittent FMLA leave after it expired. She did, however, apply for FMLA leave for approximately one month from February to March of 2010 to care for Ernestine Reed, which Plaintiff identified as her "mother" in her leave request. (February 2010 Leave Request, Def. Ex. 41 [Docket Item 23-8].)

Reed was actually Plaintiff's aunt. Plaintiff testified that Reed had raised Plaintiff since Plaintiff was a child and had "signed every paper for [Plaintiff] from Kindergarten up until [Plaintiff] was out of school." (Aug. 7, 2013 Fitzgerald Dep. [Docket Item 26-5] 83:15-18.) Plaintiff further testified that when she was 12, she was named as Reed's child during Reed's divorce. (Id. 83:21-84:1.)

Plaintiff's leave request to care for her "mother" was initially denied because she did not supply documentation to show that Reed was Plaintiff's mother. (Griggs Email, Def. Ex. 40 [Docket Item 23-8].) After she attached a New Jersey State Application for Family Leave Benefits, in which she checked that Reed, the care recipient, was a parent, Plaintiff's leave

8

request was approved. (NJ Family Leave Benefits Application, Def. Ex. 42 [Docket Item 23-8].)[1]

Approximately four months later, on August 30, 2010, Plaintiff requested a second FMLA leave to care for Reed. (August 2010 Leave Request, Def. Ex. 53 [Docket Item 23-9]; SMF ¶ 76.) Defendant denied Plaintiff's leave request when it became unsure of Plaintiff's relationship to Reed. Plaintiff's supervisor, Annemarie Guerrieri, noted that during a phone conversation that same day to discuss Plaintiff's leave request, Plaintiff stated that Reed was not her biological mother and referred to Reed as her aunt, adoptive mother, and step-mother. (Guerrieri File Memo, Def. Ex. 49 [Docket Item 23-8].) Guerrieri "was not quite sure what the relationship was between [Reed] and [Plaintiff]," and called Human Resources to inform them of the situation. (Id.) Nunzi, who approved all FMLA leave requests, asked Plaintiff for documentation showing Plaintiff's relationship to Reed. (Nunzi Dep. 28:12-29:6.) Plaintiff offered to provide report cards from school showing that Reed had raised her. (Aug. 7 Fitzgerald Dep. 112:13-20; Nunzi Dep. 90:24-91:7.)[2]

---

[1] Plaintiff requested and was granted two extensions of that leave so that she could continue caring for her aunt. She returned to work in April 2010. (Aug. 7 Fitzgerald Dep. 115:12-13.)

[2] At deposition, Griggs, who processed FMLA applications, stated that she did not believe the school records Plaintiff stated she could provide would be "sufficient under the law" to prove that

Plaintiff did not ultimately provide the report cards. She did not return to work the next day, which was August 31. On September 1, she provided a doctor's note which excused her from work from August 26 to September 9, due to hypertension, anxiety, depression, and hyperlipidemia. She subsequently provided a second doctor's note extending her leave to September 22. (Physician's Notes, Def. Exs. 56-57 [Docket Item 23-9].) On September 10, Plaintiff submitted a formal request for FMLA leave from August 26 through September 22. (Sept. 2010 Leave Request, Def. Ex. 48 [Docket Item 23-8].) Defendant approved her leave request. Plaintiff extended her leave a third time due to her medical condition and returned to work on September 29. (Physician's Note, Def. Ex. 59 [Docket Item 23-9].)

Between September 28, 2010 and February 26, 2011, Plaintiff accrued several "incidents" for unexcused absences in October and November of 2010 and January and February of 2011. She received three Counseling Notices for a total of four Notices within the trailing twelve-month period. (SMF ¶¶ 86-92.) She received her third Counseling Notice on March 2, 2011, one and a half months before she was ultimately terminated. Plaintiff then asked Nunzi whether she was going to be fired. Nunzi told her

---

Plaintiff's aunt qualified as a parent under the FMLA. (Griggs Dep. 22:21-24.)

that it was a possibility but that she "probably will be suspended because [she had] no other write-ups for any behavior" in her file. (Dec. 9 Fitzgerald Dep. 52:22-53:7.)

    4. Plaintiff's Termination on April 22, 2011

    While at work on April 13, 2011, Plaintiff reported to her supervisor that she thought her heart was "beating abnormally." (Arb. Tr., Pl. Ex. B [Docket Item 26-6] 282:6-12.) She received permission from her supervisor to leave work and go to the emergency room at AtlantiCare Regional Medical Center. She was told that she was "in bigeminy" and that an EKG and stress test would be administered. (Id. 284:19-24.) She went back to the hospital the next day, April 14, for various tests. She was treated by Dr. Sujood Ahmend, who noted impressions of chest pain, ventricular bigeminy, dyspnea on exertion, WPW, hyperlipidemia, obesity, and hypertension, and recommended additional testing and a follow-up visit in several weeks. (Ahmed Letter, Pl. Ex. L [Docket Item 26-16].) Due to her heart condition, Plaintiff voluntarily cancelled her shifts for April 14 and 16 and was not required to report to work. (SMF ¶ 97.) She was not scheduled to work on April 15. Plaintiff was supposed to work on April 17, but called the hospital to tell them that she was sick. Plaintiff "was still having the abnormal heart rhythm" and was feeling short of breath that day. (Arb.

Tr. 286:13-24.)

The parties dispute what happened next. Plaintiff came into work on April 18th to attend a mandatory training session. According to Plaintiff, she gave Guerrieri a doctor's note that day to explain her absence. The note, signed by a nurse practitioner, Jean Stern, whom plaintiff claims works for Dr. Ahmad, stated, "Please excuse from work on 4/17/11 above 2° arrhythmia." (Doctor's Note, Pl. Ex. R [Docket Item 26-22].) Plaintiff also asserts that she told Guerrieri that day that she "would have more papers for [Guerrieri] when [Plaintiff] came back" to work, and that Guerrieri stated that that was "okay." (Dec. 9 Fitzgerald Dep. 57:13-16; Arb. Tr. 287:17-288:7.) Defendant denies having received any note from Plaintiff and asserts that the only explanation it received for Plaintiff's April 17th absence was a phone call in which Plaintiff stated that she was "sick," with no further explanation. (SMF ¶¶ 98-101; Counter SMF ¶¶ 81-85; Resp. to Counter SMF ¶ 83.)

Plaintiff's next scheduled day of work was April 22, 2011. She was terminated that day. An April 22 termination notice from Laura Kennedy, Director of Labor Relations at Shore, states that Plaintiff was terminated "due to Time and Attendance related issues." [Termination Notice, Def. Ex. 65 [Docket Item 23-9]; SMF ¶ 102.]

12

### 5. Race Discrimination

Plaintiff makes several factual assertions with respect to
her race discrimination claim, which Defendant disputes. First,
Plaintiff states that she was given patients "that nobody else
would want" because of her race. (Dec. 9 Fitzgerald Dep. 110:18-
20.) She asserts that she was given more patients in isolation
compared to other nurses. (Dec. 9 Fitzgerald Dep. 111:18-23;
Counter SMF ¶ 7.)

Kasey Cochrane, a former Nurse's Aide at Shore, testified
that Plaintiff would "get the harder assignments," and that the
supervisors would refuse to change assignments for Plaintiff
even though they would do so for other nurses. (Cochrane Dep.
Pl. Ex. E [Docket Item 26-9] 10:8-15.)

Plaintiff also asserts that her co-workers and supervisors
made statements she found offensive. As an example, Plaintiff
testified that co-workers described one patient as a "really big
stinky black guy," specifically including his race. (Dec. 9
Fitzgerald Dep. 123:2-23.)

Plaintiff once complained to Guerrieri, but Guerrieri
accused Plaintiff of playing the "race card." (Id. 125:14-22.)
Sometime in 2010, she also complained to Executive Director of
Nursing, Joan Gavin, and Alan Beatty about co-workers making
offensive remarks. (Id. 132:12-135:9).

Gavin promised that there would be sensitivity training, but Plaintiff states that the training was never held. (Dec. 9 Fitzgerald Dep. 132:5-133:17; Counter SMF ¶ 10.) Defendant disagrees. Nunzi testified that the hospital had anti-discrimination and anti-harassment trainings and required each employee of the hospital to do an annual training once a year. (Nunzi Dep. 41:11-21.) Nunzi also testified that she was not aware of any employee who had made a complaint of discrimination. (Id. 42:17-43:2.)

6. Arbitration

Plaintiff is a member of the New York State Nurses Association, and is subject to a collective bargaining agreement. The Union grieved Plaintiff's termination, and, pursuant to the agreement, an arbitration hearing was held on April 3, 2012. (Counter SMF ¶¶ 92-93.) At issue during the arbitration was whether Plaintiff was terminated for just cause. (Arb. Op., Def. Ex. 66 [Docket Item 23-9].)

The Arbitrator denied Plaintiff's grievance. In an Opinion dated October 5, 2012, the Arbitrator held that Shore's time and attendance policy was "fair on its face." (Arb. Op. at 14.) The Arbitrator also held that Plaintiff was justly terminated based on Shore's time and attendance policy, and Plaintiff was at fault for "not placing herself in intermittent FMLA leave in

14

light of her various medical conditions." (Arb. Op. 12-14.)  The Arbitrator chose not to reach the issue whether Plaintiff was discriminated against because the evidence presented was insufficient to reach a judgment. (Id. at 14.)

## III. STANDARD OF REVIEW

The defendant, as the party moving for summary judgment, must show that there are no issues of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, here the plaintiff, to demonstrate specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court must review the facts and draw all inferences in light most favorable to the non-moving party, which in this case is Plaintiff Shawn Fitzgerald. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

The question on summary judgment is whether the evidence presents "sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. If a fair-

15

minded jury could return a verdict for the non-moving plaintiff on the evidence presented, summary judgment will be denied. If the plaintiff fails to make a showing sufficient to establish an essential element of her case, for which she bears the burden of proof at trial, summary judgment will be granted. Celotex, 477 U.S. at 322-23.

## IV.   DISCUSSION

### A. Plaintiff's previous arbitration does not have preclusive effect

Plaintiff's suit is not precluded by the October 5, 2012 arbitration decision finding that Plaintiff was terminated for just cause. Collateral estoppel, or issue preclusion, "prevents relitigation of a particular fact or legal issue that was litigated in an earlier action." Seborowski v. Pittsburgh Press Co., 188 F.3d 163, 169 (3d Cir. 1999) (citing Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 (1979)). The doctrine of issue preclusion may be applied where: (1) the identical issue was decided in a prior adjudication; (2) the issue was actually litigated; (3) there was a final judgment on the merits; (4) the determination was essential to the earlier judgment; and (5) the party against whom the doctrine is asserted was a party or in privity with a party to the earlier proceeding. Sebrowski, 188 F.3d at 169; Robbins v. U.S. Foodserv. Inc., 2012 WL 3781258, at *4 (D.N.J. Aug. 30, 2012) (Simandle, J.); Ivan v. Cnty. of

16

Middlesex, 595 F. Supp. 2d 425, 474 (D.N.J. 2009).

Judicial proceedings may accord preclusive effect to arbitrations that have adjudicated the same claims or defenses. Robbins, 2012 WL 3781258, at *4; Gruntal & Co., Inc. v. Steinberg, 954 F. Supp. 324, 337 (D.N.J. 1994). However, in reviewing an arbitral decision for preclusive effect, courts must keep in mind that arbitrators are "not bound by the same rules of evidence and procedure that judges are, and 'must be cautious of procedural variances between arbitral proceedings and judicial proceedings when deciding whether to give preclusive effect to the former.'" Id. (citing Greenblatt v. Drexel Burnham Lambert, Inc., 763 F.2d 1352, 1361 (11th Cir. 1985) and Gen. Comm. of Adjustment v. CSX R.R. Corp., 893 F.2d 584, 593 (3d Cir. 1990)). Accordingly, "'issue preclusion based on a prior arbitration is permissible but not mandatory.'" Shtab v. Greate Bay Hotel and Casino, Inc., 173 F. Supp. 2d 255, 261 (D.N.J. 2001) (quoting Osuala v. Comty. Coll. of Philadelphia, 2000 WL 1146623, at *5 (E.D. Pa. Aug. 15, 2000)).

Defendant argues that the Arbitrator's finding that Plaintiff was fired for "just cause" precludes her from relitigating the cause of her termination. Upon closer examination, however, the Court finds that collateral estoppel does not apply because the issue raised in this case was not

decided by the Arbitrator. Plaintiff's claims in this case
relating to her termination turn on whether her missed day of
work on April 17, 2011 was protected by the FMLA. By contrast,
the arbitration decision focused on whether Plaintiff was fired
in accordance with the time and attendance policy and whether
the attendance policy was reasonable. (See Arb. Op. at 13-14.)
The Arbitrator noted the applicability of the FMLA but did not
examine it, stating merely that Plaintiff was not on
intermittent FMLA leave at the time she missed work. (Id. at
13.) In other words, the Arbitration Opinion decided that
Defendant had reason under the attendance policy to fire
Plaintiff without squarely answering the question of whether the
termination was illegal because Plaintiff's leave on April 22
was nevertheless FMLA-protected.

    This Court's decision in Robbins does not control. In
Robbins, the Arbitrator made an explicit finding that the
plaintiff employee had lied about taking FMLA leave to cover up
a plan to spend time in Myrtle Beach for a vacation. Robbins,
2012 WL 3781258, at *2. The Arbitrator's finding that the
employer had "just cause" to terminate the plaintiff was
therefore based squarely on a finding that the FMLA did not
protect the plaintiff during the time she missed work.

    The Arbitrator made no such finding here. Although the

Arbitrator's Opinion held that Shore had reason to fire Plaintiff for violating its attendance guidelines, it did not decide the critical question of whether Plaintiff was nevertheless protected by the FMLA on the day she missed work. Nor did the Opinion examine the issue of causation or pretext and whether Plaintiff's termination was due to the fact that she violated the attendance guidelines.[3]

Accordingly, the Court finds that the arbitration award should not be given preclusive effect in this litigation.[4]

---

[3] There is ample support for the general proposition that adverse arbitral decisions do not necessarily preclude an employee from subsequently litigating his federal statutory claims, including claims under the FMLA, in a judicial forum. See, e.g., McDonald v. City of West Branch, 466 U.S. 284, 290-92 (1984) (holding that § 1983 claims were not precluded by adverse arbitral decisions because a preclusive effect would undermine the statute's efficacy in protecting federal rights and noting reasons why arbitral decisions do not provide adequate substitute for a judicial trial); Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974) (Title VII); Shtab, 173 F. Supp. 2d at 261 (FMLA claims not precluded by arbitral decision); Slaughter v. Am. Bldg. Maintenance Co., 64 F. Supp. 2d 319, 330-31 (S.D.N.Y. 1999) (same).

[4] The Court additionally notes that Defendant has not shown that the arbitration decision was ever judicially confirmed. "Absent judicial confirmation, an arbitration award will not result in a 'final judgment' and cannot, therefore, have preclusive effect on subsequent litigation." Gruntal, 854 F. Supp. at 337; see also Leddy v. Standard Drywall, Inc., 875 F.2d 383, 385 (2d Cir. 1989) ("[I]t is the judgment entered on an arbitration award that is given preclusive effect in subsequent litigation. An arbitration award that is not filed and confirmed in an appropriate court is without effect." (emphasis in original)). The record does not show that the arbitration decision was judicially confirmed, and the Court cannot conclude at this time that the arbitration decision should be given "final effect."

**B. FMLA Claims**

An employer may be sued under the FMLA for interfering with an employee's FMLA rights, as well as for retaliating against an employee who exercises rights under the FMLA. Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 317 (3d Cir. 2014). "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009). Plaintiff asserts both interference and retaliation claims.

**1. Interference under the FMLA**

29 U.S.C. § 2615(a)(1) of the FMLA prohibits an employer from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" that it guarantees. "Interference" includes "[a]ny violations of the [FMLA] or of these [FMLA] regulations." 29 C.F.R. § 825.220(b). An interference claim under § 2615(a)(1) is "not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Callison v. City of Philadelphia, 430 F.3d 117, 120 (3d Cir. 2005). To prevail on an FMLA interference claim, an employee need only show that (1) she was entitled to benefits under the FMLA; and (2) she was denied them. Lichtenstein v. Univ. of

Pittsburgh Med. Ctr., 691 F.3d 294, 312 (3d Cir. 2012);
Callison, 430 F.3d at 119; Parker v. Hanhemann Univ. Hosp., 234
F. Supp. 2d 478, 485 (D.N.J. 2002). She does not need to show
that the employer treated other employees more or less
favorably, and the employer cannot excuse its action by offering
a legitimate business reason as justification. Id. The
interference inquiry is merely about whether the employer
provided its employee with the entitlements and protections
guaranteed by the FMLA. Hodgens v. Gen. Dynamics Corp., 144 F.3d
151, 159 (3d Cir. 1998).

Plaintiff asserts that Defendant interfered with her FMLA
rights when it fired her for missing work on April 17, 2011.
Plaintiff additionally argues that Defendant interfered with her
FMLA rights when it wrongfully denied her leave to visit her
sick aunt on August 2010, and required Plaintiff to provide a
note from healthcare workers each time Plaintiff took an FMLA-
related absence.

      i.  A genuine issue of material fact exists as to
           whether Plaintiff gave sufficient notice that her
           April 17, 2011 absence was covered by the FMLA

Whether Plaintiff was entitled to leave under the FMLA on
April 17, 2011 is not under dispute. Defendant argues, however,
that there was no interference with Plaintiff's FMLA rights
because Plaintiff did not provide adequate notice that she was

taking FMLA leave.

In order to invoke the protections of the FMLA and state a claim of interference, an employee must provide an employer with sufficient notice that she is using leave under the FMLA. Although an employee need not provide written notification or even expressly mention the FMLA, she must provide at least "verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007) (citing 29 C.F.R. § 825.302(c)). "Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job . . . ." 29 C.F.R. 825.303(b). When the need for leave is not foreseeable, an employee must provide notice to the employer "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). Thus, in situations where the employee requires emergency medical treatment, "written advance notice . . . may not be required when FMLA leave is involved." 29 C.F.R. § 825.303(c).

In Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294 (3d Cir. 2012), the Third Circuit noted that FMLA regulations "clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed

information for the employer to know if the FMLA actually
applies." If the employer does not have enough information about
the reason for an employee's use of leave, the employer must
inquire further to determine whether the leave potentially
qualifies under the FMLA. 691 F.3d at 303. The crucial test for
sufficient notice under the FMLA is not whether the employee
gave enough detail to determine if the FMLA applies, but "'how
the information conveyed to the employer is reasonably
interpreted.'" Id. (quoting Sarnowski, 510 F.3d at 402). The
inquiry is generally a question of fact, not law. Id.; see also
Zawadowicz v. CVS Corp., 99 F. Supp. 2d 518, 529 (D.N.J. 2000).

Summary judgment is not appropriate in this case because
there is a genuine dispute of material fact over whether
Plaintiff gave sufficient notice under the FMLA. The parties do
not dispute that Plaintiff made a call to the hospital before
her shift on April 17th saying that she was "sick." However,
Plaintiff asserts that on April 18, the day after she missed her
shift, she came into work and handed Guerrieri a doctor's note
excusing Plaintiff from work on April 17 due to her arrhythmia.
(Doctor's Note, Pl. Ex. R.) What's more, Plaintiff asserts that
Guerrieri accepted the note and said it was "okay" for Plaintiff
to bring in additional physicians' records when she came back to
work. Because Plaintiff's condition was unforeseeable, the

23

doctor's note could have been enough to convey to Defendant that the Plaintiff needed to take FMLA-qualifying leave. <u>See Brenneman v. MedCentral Health Syst.</u>, 366 F.3d 412, 421 (6th Cir. 2004) ("[T]he critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job."); <u>Rosenfeld v. Canon Business Solutions, Inc.</u>, at 2011 WL 4527959, at *9 (D.N.J. Sept. 26, 2011) (doctor's note confirming diagnosis of insomnia provided adequate notice to employer that FMLA applied). Defendant asserts that it received no such note from Plaintiff and that the only notice it had of Plaintiff's condition was when she called in sick with no explanation the morning of on April 17. (Def. Br. at 15-16; Def. Reply at 8-9.) The parties therefore disagree over the precise notice that was given to the Defendant, which bears directly on the question of whether Plaintiff sufficiently invoked her rights under the FMLA.

Moreover, a reasonable jury could find that, even without the doctor's note, Shore had enough information about Plaintiff's heart condition that at the very least, it should have inquired into Plaintiff's need for leave before terminating

24

her. See Lichtenstein, 691 F.3d at 305 (noting that "if an employee's initial notice reasonably apprises the employer that FMLA may apply, it is the employer's burden to request additional information if necessary"). Plaintiff's previous periods of FMLA leave for WPW should have alerted Defendant that her absence may be covered by the FMLA when Plaintiff went to the emergency room on April 13th, since Plaintiff expressly told Defendant about her abnormal heart rate before going to the hospital. It would not have been a stretch for Defendant to assume that Plaintiff cancelled her shift the next day due to the same heart condition that sent her home early, and that Plaintiff's calling in "sick" a few days later on April 17th was also related to the same health problem. A reasonable jury could find that Defendant should have asked Plaintiff about the need for leave under the circumstances. See Zawadowicz v. CVS Corp., 99 F. Supp. 2d 518, 529 (D.N.J. 2000) (denying summary judgment because plaintiff's phone messages to employer – that he was not coming to work – raised genuine dispute about whether plaintiff provided adequate and timely notice that he was taking FMLA leave).[5]

The Court is not persuaded by Defendant's argument, citing

---

[5] Here, of course, Plaintiff asserts more. She states that she provided a doctor's note the day after her absence explaining that she was out due to arrhythmia.

Escriba v. Foster Poultry Farms, Inc., 743 F.3d 1236 (9th Cir.
2014), that it was reasonable to conclude, based on Plaintiff's
pattern of submitting FMLA leave forms each time she needed time
off, that Plaintiff had decided not to take FMLA leave for her
sick day on April 17th. In Escriba, there was evidence in the
record that the plaintiff specifically asked her supervisor for
"vacation time" and not "family leave." 743 F.3d at 1241. By
contrast, there is no evidence in the record here that Plaintiff
expressed a specific desire not to use her FMLA leave. Indeed,
it would be strange to conclude that, rather than invoke her
FMLA rights, Plaintiff opted for an unscheduled absence which
would result in an "incident" and subject her to termination.[6]

This demonstrates, of course, that a reasonable jury could
decide this issue either way. Because there is a genuine dispute
concerning whether Plaintiff provided adequate notice of her
FMLA-protected leave, the Court will deny summary judgment on
Plaintiff's interference claim under the FMLA.

> ii. No reasonable jury could find that denial of
>     Plaintiff's August 2010 leave request amounted to
>     interference under § 2615(a)(1)

---

[6] Defendant also appears to challenge the timeliness of
Plaintiff's notice (see Def. Br. at 19), but advance notice of
absence is only required "when the need for leave is
foreseeable." Zawadowicz, 99 F. Supp. 2d at 530. Where, as here,
Plaintiff's symptoms appeared suddenly and her absence was not
foreseeable, notice need only be given "as soon as practicable."
See Megonnell v. Infotech Solutions, Inc., 2009 WL 3857451, at
*6 (M.D. Pa. Nov. 18, 2009).

Plaintiff argues that Defendant additionally interfered with her FMLA rights when it denied her August 2010 request to care for her sick aunt, Ernestine Reed. (Pl. Br. 9-10.) Here, the Court will grant summary judgment because it agrees with Defendant that Plaintiff did not provide sufficient information to support that she was entitled to FMLA leave.

29 C.F.R. § 825.303(b) provides that while it is the employer's duty to request additional information to determine whether an employee qualifies for leave under the FMLA, an employee "has an obligation to respond to an employer's questions" regarding the leave. Moreover, "[f]ailure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying." 29 C.F.R. § 825.303(b).

In this case, Defendant asked Plaintiff for additional information regarding her relationship with Reed after learning from Plaintiff herself that Reed was not her biological mother, as it previously believed. In a conversation with Guerrieri about her FMLA leave request, Plaintiff referred to Reed as her adopted mother, her stepmother, and her aunt. Since the FMLA is not available for an employee to care for a seriously ill aunt, Defendant asked Plaintiff for some documentation to ascertain

27

Reed's relationship. Although Plaintiff offered to bring report cards to show that Reed qualified under the FMLA's *in loco parentis* rule, Plaintiff ultimately did not do so. Instead, she submitted a new leave request for her own medical condition, which Defendant granted.

Summary judgment in favor of Defendant is warranted based on these facts. Plaintiff's own statements about Reed were contradictory and did not indicate their exact relationship. Defendant therefore properly requested additional information to determine whether the leave was FMLA-qualifying, pursuant to § 825.303(b). Had Defendant denied Plaintiff's request even after Plaintiff provided supporting documentation showing that Reed stood *in loco parentis* to Plaintiff, there would be a genuine issue of material fact over whether Plaintiff has a claim of interference.

Here, however, Plaintiff failed to respond to Defendant's questions, and Defendant had nothing to support that Plaintiff's aunt qualified under the FMLA. 29 C.F.R. § 825.303(b) ("[f]ailure to respond to reasonable employer inquiries regarding the leave request may result in denial . . . if the employer is unable to determine whether the leave is FMLA-qualifying.") Moreover, Plaintiff subsequently submitted a new leave request for her own medical condition covering the same

dates as her initial leave request, which Defendant immediately granted. Thus, as a practical matter, Plaintiff received the days she originally requested for leave.[7] Based on these facts, no reasonable jury could find that Defendant's denial of Plaintiff's leave under these circumstances violated the FMLA.

### iii. No reasonable jury could find that Defendant's requirement for a doctor's note for intermittent FMLA leave interfered with Plaintiff's FMLA rights.

Plaintiff additionally argues that Defendant interfered with her rights when it requested a doctor's note for each absence she took as part of her intermittent FMLA leave. (Pl. Br. 7-8.) Citing 29 C.F.R. § 825.307(a), Plaintiff contends that an employer cannot request a doctor's note for each absence taken pursuant to intermittent FMLA leave. 29 C.F.R. § 825.307(a) (employer may not request additional information from health care provider once an employee submits a "complete and sufficient certification"); (Pl. Br. 8) (citing Oak Harbor Freight Lines v. Antti, 998 F. Supp. 2d 968 (D. Oreg. 2014) and Police Benv. Ass'n v. Cnty of Burlington, 2013 WL 173793, at *6 (N.J. Super. Ct. Jan. 17, 2013)).

---

[7] Plaintiff's second leave request, submitted on September 10, 2010, excused her for a medical condition beginning August 26, 2010. (Sept. 2010 Leave Request, Def. Ex. 48.) Defendant granted her request in full, including for the retroactive dates that were originally covered under her family leave request.

The parties primarily dispute whether Defendant actually had a policy of requiring doctor's notes as alleged by Plaintiff. Plaintiff points to two intermittent FMLA leave requests, one for herself and one for another nurse, in which Defendant wrote in the "Comments" line, "Please submit Dr's note to Human Resources for each incidence of illness related to leave." (Pl. March 2007 Leave Request, Pl. Ex. N; June 2008 Leave Request, Pl. Ex. O.) Defendant, on the other hand, points to Plaintiff's testimony during the arbitration hearing in which she stated that she did not have to submit a doctor's note each time she went on intermittent leave. (Def. Reply Br. 5)

The Court holds that summary judgment is appropriate because nothing in the record suggests that Plaintiff was actually held to any such policy. Plaintiff's brief does not cite to a single example of when she was asked to submit a doctor's note while she was on intermittent FMLA leave. Moreover, although the two leave request forms noted by Plaintiff included the comment, Plaintiff's second intermittent leave request was approved with no such written comment. (See Sept. 2008 Leave Request, Pl. Ex. N).

At deposition, Nunzi testified that Defendant's policy was different from Plaintiff's description. In response to the question of whether a doctor's note was required for

30

intermittent leave, Nunzi responded, "They have to have a note in the beginning to tell us the duration of the leave, but if they are not seeing a doctor, no." (Nunzi Dep. 46:8-13.) During the arbitration hearing, Plaintiff also testified, "Once you have intermittent leave, [a doctor's note] is already on the record. I don't have to submit one each time I'm out, because it's already on the record." (Arb. Tr. 262:9-13). Plaintiff's remark is consistent with Nunzi's statement.

Because there is no evidence in the record showing that Plaintiff was actually required to submit a doctor's note for each absence taken under intermittent FMLA leave, summary judgment will be granted in favor of Defendant.

### 2. Discrimination under the FMLA

#### i. A genuine issue of material fact exists as to whether Plaintiff was terminated for taking FMLA leave.

Plaintiff's second theory of recovery is known as the retaliation, or discrimination, theory pursuant to § 2615(a)(2) of the FMLA. While § 2615(a)(1) prohibits employers from interfering with employees' exercise of FMLA rights, § 2615(a)(2) prohibits employers from discriminating against employees who have taken FMLA leave. 29 U.S.C. § 2615(a)(2). Under section (a)(2), an employer is prohibited "from discriminating against an employee . . . for having exercised or

attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). An employer also cannot use the taking of FMLA leave as "a negative factor in employment actions, such as hiring, promotions or disciplinary actions." Id.; see also Hodges v. Gen. Dynamics Corp., 144 F.3d 151, 159-60 (3d Cir. 1998).

In this Circuit, the McDonnell Douglas burden-shifting framework applies to FMLA discrimination claims. Hodgens, 144 F.3d at 160; see also Gventer v. Theraphysics Partners of Western Pa., Inc., 41 Fed. Appx. 552, 553 (3d Cir. 2002); Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 532 (D.N.J. 2008). A plaintiff employee must first establish a prima facie case of discrimination or retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To do so, the plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was subject to an adverse employment decision; and (3) there is a causal link between the protected activity and the subsequent adverse job action. Hodgens, 144 F.3d at 161 (citing Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997)). By presenting enough evidence for a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against her.

Once a prima facie case has been established, the burden shifts to the defendant to articulate a legitimate,

32

nondiscriminatory reason for the adverse action. Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997). The defendant need not persuade the court that it was actually moved by the proffered reasons; rather, it is sufficient for the employer to raise a genuine issue of fact as to whether it discriminated against the plaintiff. Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). If the employer's evidence creates a genuine issue of fact, the presumption drops from the case and the burden shifts back to the plaintiff, who must then show that the employer's proffered explanation was pretext and that the employer's real reason for retaliating against her was because she took FMLA-protected leave. Hodgens, 144 F.3d at 161; Thurston, 941 F. Supp. 2d at 532.

"[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009); see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294 (3d Cir. 2012). Plaintiff argues that her termination for an FMLA-protected absence on April 22, 2011 also violated § 2615(a)(2).

Summary judgment on this claim is denied for the same

reason it was denied on Plaintiff's interference claim. The
Court at this juncture cannot determine whether Plaintiff was
entitled to leave under the FMLA because there is a material
dispute whether Defendant received sufficient notice that
Plaintiff's request fell under the FMLA. In other words, there
is a genuine dispute whether Plaintiff sufficiently invoked her
FMLA rights.

In addition, a reasonable jury could conclude that the
record supports the remaining elements of a prima facie case.
There is no dispute that Plaintiff's termination constituted an
adverse employment decision. Moreover, the evidence with respect
to the element of causation is sufficient to defeat summary
judgment. The question of causation "must be considered with a
careful eye to the specific facts and circumstances
encountered." Farrell v. Planters Lifesavers Co., 206 F.3d 271,
279 n.5 (3d Cir. 2000). Generally, to demonstrate a causal
connection, a plaintiff must show "either (1) an unusually
suggestive temporal proximity between the protected activity and
the allegedly retaliatory action, or (2) a pattern of antagonism
coupled with timing to establish a causal link." Budhun v.
Reading Hosp. and Med. Ctr., 765 F.3d 245 (3d Cir. 2014)
(quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259,
267 (3d Cir. 2007)).

In this case, Plaintiff was fired just five days after her absence from work on April 17. Such "close temporal proximity qualifies as unusually suggestive timing" and provides a causal link between Plaintiff's absence and her termination. Budhun, 765 F.3d at 258; Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (termination less than a week after the plaintiff invoked her right to FMLA leave was sufficient to establish causation); see also Wierman v. Casey's Gen. Stores, 638 F.3d 984, 1000 (8th Cir. 2011) (termination several days after the plaintiff took FMLA covered leave was sufficient to establish causation); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007) (employee who was notified of her termination three months after requesting FMLA leave and the day she was scheduled to return to work was sufficient to establish a causal connection).

Defendant argues that Plaintiff was fired solely because of her attendance problems. Indeed, at the time Plaintiff was terminated, she had accumulated four counseling notices in a twelve month period, which allowed her to be fired pursuant to the guidelines. Her termination was therefore consistent with Defendant's policy.

However, there is evidence to indicate that Defendant's proffered reason was pretext for retaliation. First, Plaintiff

35

was subject to termination in March when she received her fourth counseling notice. Thus, Defendant was aware of Plaintiff's poor record of attendance one month prior to firing her in April. Despite this knowledge, Defendant terminated Plaintiff on April 22, a few days after her absence for heart complications. The timing of the incident could lead a reasonable jury to conclude that Defendant would not have fired Plaintiff but for her taking the day off in April. See Lichtenstein, 691 F.2d at 311-12 (finding that plaintiff had met her burden of demonstrating pretext where Defendant had long been aware of her performance deficiencies but fired her days after taking FMLA leave); Kohls v. Beverly Enterprises Wisconsin, Inc., 259 F.3d 799 (7th Cir. 2001) (record showing that employer had been aware of plaintiff's performance problems prior to taking FMLA leave "cast[s] doubt on the timing of the purported reasons for [the plaintiff's] termination.").

Additionally, as the Court has already explained, there is evidence suggesting that Defendant knew Plaintiff's absence was for a serious medical condition and the termination was motivated in part by that knowledge. Cf. Moore v. City of Philadelphia, 461 F.3d 331, 351 (3d Cir. 2006) ("To the extent that [the Title VII plaintiff] relies upon the brevity of the time periods between the protected activity and alleged

retaliatory actions to prove causation, he will have to show as well that the decision maker had knowledge of the protected activity." (internal citations omitted)). Defendant knew that Plaintiff, who suffered from a heart condition, had gone to the hospital a few days before for an abnormal heart rate. It also knew that Plaintiff had called in "sick" on April 17th. With these two pieces of information, Defendant could have reasonably suspected that Plaintiff was recovering from symptoms related to WPW and her absence was protected by the FMLA, particularly in light of Plaintiff's history of taking FMLA leave to treat her condition. Moreover, if the doctor's note had in fact been given to Defendant – a factual issue which cannot be resolved at this time – it further establishes that Defendant was aware that Plaintiff was taking FMLA-related leave.[8]

Finally, there is also uncertainty over whether Plaintiff's absence even qualified as a "no call/no show" triggering an incident under the Guideline. The Guideline states that failure to show up at work <u>and</u> to contact one's supervisor before the

---

[8] The Court does not find conclusive the fact that Defendant had previously approved Plaintiff's requests for FMLA leave without incident, or that Plaintiff's April 22 request deviated from her usual way of requesting FMLA leave. Defendant may well have failed to realize that Plaintiff was requesting FMLA-protected leave, but in light of Plaintiff's evidence to the contrary, the question of what Defendant knew is one that is more appropriate for the jury.

start of one's shift qualifies as an "incident." Yet Plaintiff notified Defendant before her shift began and stated that she was sick. Rather than wait for Plaintiff to provide additional documentation on her next scheduled shift on April 22, Defendant decided to terminate her immediately. Giving Plaintiff, as the party opposing summary judgment, the benefit of reasonable favorable inferences from the evidence in the record, there is sufficient evidence in the record to support a jury finding of pretext.

Because a reasonable jury could conclude that Plaintiff was fired because of an absence which Defendant knew was likely protected by the FMLA, the Court will deny summary judgment with respect to Count Two.

ii. Defendant is entitled to summary judgment on Plaintiff's remaining theories of FMLA discrimination

Plaintiff advances two additional theories of discrimination, arguing that Defendant violated the FMLA by issuing Plaintiff counseling on December 8, 2009 for Plaintiff's FMLA absence; and by "closely tracking" Plaintiff's attendance upon her return to work after FMLA leave in September 2010. The evidence in the record is insufficient to defeat summary judgment, even when considered in light most favorable to Plaintiff.

With respect to the claim of counseling in 2009 for an absence on March 6th and 7th of that same year, Plaintiff's discrimination claim is barred by the FMLA's statute of limitations. Under 29 U.S.C. § 2617(c)(1), FMLA actions must be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." This period is extended to three years if the plaintiff alleges a "willful violation" of the FMLA. § 2617(c)(2). Plaintiff's claim is based on a disciplinary action she received on December 8, 2009 for a March 2009 incident. Plaintiff, however, did not file this action until October 4, 2012, nearly one year past the FMLA's two-year limitations period. As Plaintiff does not allege willfulness, Plaintiff's claim is beyond the statute of limitations.

As for the contention that Defendant closely monitored Plaintiff's attendance after she came back from FMLA leave on September 2010, Plaintiff's claim is based on nothing more than supposition. The only evidence Plaintiff cites is an email from Griggs to Beatty, dated October 20, 2010, in which Griggs listed the dates in October that Plaintiff worked or called out sick. (October 20, 2010 Griggs Email, Pl. Ex. P.) The email does not indicate that Beatty had asked Griggs to "closely track" Plaintiff's attendance upon her return. The compilation of dates

in a single email, along with the reference to Kronos, Defendant's electronic attendance system, suggests that Griggs was merely taking information from the hospital's attendance record. Despite Plaintiff's suggestion to the contrary, Beatty did not testify to asking Griggs to track Plaintiff's attendance. In fact, neither he nor Griggs remembered what the email was for. (Pl. Ex. G 98:13-99:1; Pl. Ex. J 60:4-12.) In short, there is nothing in the record which indicates that Defendant "closely tracked" Plaintiff's attendance.

Plaintiff's claim also fails because "closely tracking" an employee's attendance hardly constitutes an "adverse employment decision" under the FMLA. Plaintiff has not shown that Defendant's act of tracking was so intrusive that it affected her compensation, terms, conditions or privileges of employment. Even if the tracking led to Plaintiff's counseling shortly thereafter, the counseling was based on Plaintiff's poor attendance record, for which she alone was responsible. Thus, Plaintiff cannot show that the attendance tracking was a materially adverse act. Sconfienza v. Verizon Pennsylvania, Inc., 307 Fed. Appx. 619, 621-22 (3d Cir. 2008). Defendant's motion for summary judgment will be granted with respect to Plaintiff's discrimination claims based on improper counseling and "closely tracking" Plaintiff's attendance.

40

### C. NJLAD Claims

The New Jersey Law Against Discrimination ("NJLAD") was enacted with the express purpose of protecting civil rights, particularly in the area of employment discrimination. <u>See</u> <u>Viscik v. Fowler Equip. Co.</u>, 173 N.J. 1, 16 (2002). Section 10:5-12(a) makes it unlawful for an employer to discriminate against an individual because of that person's disability or race. N.J.S.A. § 10:5-12(a). Section 12(d) of the NJLAD prohibits retaliation against an employee because that employee "has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]" N.J. Stat. Ann. § 10:5-12(d); <u>Cortes v. Univ. of Med. & Dentistry of N.J.</u>, 391 F. Supp. 2d 298, 314 (D.N.J. 2005).

Plaintiff argues that that Defendant violated the NJLAD's anti-discrimination and anti-retaliation provision when it refused her request for a reasonable accommodation by denying her request for a day off on April 17, 2011, and when it fired her because of her disability and her accommodation request. She also contends that she was discriminated against on the basis of race, under the theories of hostile work environment, disparate treatment, and discriminatory firing.

### 1. A genuine issue of disputed fact prevents summary judgment on Plaintiff's claim that she was terminated

**for her disability.**

Relying on the same assertions she made in her claim of discrimination under the FMLA, Plaintiff argues that her termination on the basis of her disability also violates the NJLAD's anti-discrimination provision.

The elements for proving disability discrimination under the NJLAD are similar to that under the FMLA. Plaintiff must first establish that (1) she was disabled within the meaning of the statute; (2) she was qualified to perform the essential functions of the position of employment; and (3) she suffered an adverse employment action because of the disability. Each of these elements must be shown, including proof of some material adverse change in the terms and conditions of employment. Jones v. Sch. Dist., 198 F.3d 403, 411 (3d Cir. 1999); Victor v. State, 952 A.2d 493, 504 (N.J. Super. Ct. App. Div. 2008). The McDonnell Douglas burden-shifting framework described above applies. Schummer v. Black Bear Dist. LLC, 965 F. Supp. 2d 493, 501 (D.N.J. 2013).

Defendant argues that Plaintiff was not disabled within the meaning of the NJLAD, that Defendant was not made aware of her disability, and that Plaintiff's many absences from work gave it a legitimate, nondiscriminatory reason for her termination.

The Court finds that admissible evidence exists to

establish Plaintiff's disability and Defendant's knowledge of her disability. The NJLAD is a remedial statute "deserving of a liberal construction," and the statutory definition a disability is very broad in scope. See Clowes v. Terminix Intern, Inc., 538 A.2d 794, 802 (N.J. 1988). New Jersey courts interpreting the statute have repeatedly emphasized that the NJLAD's definition of "disability" is not restricted to "severe" or "immutable" disabilities. Olson v. Gen. Elec. Astrospace, 966 F.Supp. 312, 315 (D.N.J. 1997); Andersen v. Exxon Co., 89 N.J. 483, 446 A.2d 486 (1982). Thus, substance abuse, obesity, breast cancer, and other conditions that are "demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques" have been accepted as disabilities under the LAD. Olson, 966 F. Supp. at 315; see also Harris v. Middlesex Cnty. Coll., 801 A.2d 397 (N.J. Super. Ct. App. Div. 2002); Gimello v. Agency Rent-A-Car Systems, 594 A.2d 264 (N.J. Super. Ct. App. Div. 1991); Matter of Cahill, 585 A.2d 977 (N.J. Super. Ct. App. Div. 1991). In Gimello, the court concluded that obesity was a handicap under the NJLAD because obesity "was a recognized medical condition for which [the plaintiff] sought legitimate treatment but with modest success." Gimello, 594 A.2d at 273.

Plaintiff's condition falls within this broad definition. Plaintiff suffers from Wolf-Parkinson-White syndrome, an ailment

that is generally understood by the medical profession as a
medical condition related to an abnormality in the heart. She
was diagnosed with the condition by various doctors and sought
legitimate treatment for it for several years. Defendant argues
that Plaintiff was not disabled because she "often worked two or
more jobs simultaneously" (Def. Br. 28), but the fact that
plaintiff "had minimal limitations on her physical capabilities
does not disqualify her from protection under the [NJLAD]."
Harris, 801 A.2d at 404. Applying the rationales used in other
New Jersey courts, Plaintiff's condition could reasonably be
considered a disability within the meaning of the NJLAD. See
Tynan v. Vicinage 13 of Superior Court, 798 A.2d 648, 656 (N.J.
Super. Ct. App. Div. 2001) (plaintiff suffering from PTSD,
depression, irritable bowel syndrome, migraines, hypertension,
reflux esophagitis, and anxiety panic attacks had "set forth
sufficient illnesses and psychological maladies" to suggest a
disability).

Admissible evidence also exists to show that Defendant was
aware that Plaintiff suffered from WPW when they terminated her.
Defendant had approved several FMLA leave requests and therefore
would have been in possession of supporting medical records
certifying that Plaintiff was diagnosed with WPW and required
intermittent treatment. Defendant's only argument is that

44

Plaintiff did not discuss the "nature or limitations of her
medical condition with anyone at Shore." That Plaintiff chose to
keep the details of her disability private is irrelevant.
Defendant knew that she suffered from WPW, and it knew that she
had requested time off in the past for her condition. Indeed,
six months before Plaintiff's termination, Defendant had
approved and twice extended Plaintiff's leave request based on
her condition. In light of the above, the Court is satisfied
that a reasonable jury could find, particularly in light of New
Jersey's broad interpretation of the NJLAD, that Plaintiff's
condition qualifies as a disability, and that Defendant knew of
her disability. Finally, the close temporal proximity between
when Plaintiff submitted a doctor's note for "arrhythmia" and
her termination creates a reasonable inference of causation.

     Although Defendant has put forward a legitimate,
nondiscriminatory reason for Plaintiff's termination, the Court
will deny summary judgment on this claim for the same reasons it
denied summary judgment on Plaintiff's FMLA discrimination
claim. Plaintiff asserts that she gave her supervisor a doctor's
note stating that she was out of work due to "arrhythmia."
Defendant denies receiving any such note but cannot explain its
existence in the record. Although Plaintiff could have been
fired earlier for her absences, the fact that she was terminated

45

days after her April 17th absence, which Defendant likely knew
was for her heart condition, suggests that Defendant's reason
was pretext.

The Court will accordingly deny summary judgment on
Plaintiff's claim that she was terminated because of her
disability.

### 2. Summary judgment is warranted on Plaintiff's failure to accommodate claim.

Failure to accommodate "is one of two distinct categories
of disability discrimination claims . . . the other being
disparate treatment discrimination." Victor v. State, 952 A.2d
493, 501 (N.J. Super. Ct. App. Div. 2008). Under the NLJAD, an
employer must "make a reasonable accommodation to the
limitations of an employee or applicant who is a person with a
disability, unless the employer can demonstrate that the
accommodation would impose an undue hardship." N.J. Admin. Code
tit. 13, § 13-2.5; see also Barboza v. Greater Media Newspapers,
2008 WL 2875317, at *2 (D.N.J. July 22, 2008).

To prevail on a failure to accommodate claim, a plaintiff
must first present the prima facie elements required in any
disability discrimination claim. In addition, the plaintiff must
establish several elements that go to the second factor of the
prima facie case. The plaintiff must show that (1) her employer
knew of her disability; (2) the plaintiff requested

accommodations or assistance for her disability; (3) the
employer made no good faith effort to assist; and (4) that
plaintiff could have been reasonably accommodated but for the
employer's lack of good faith. <u>Victor</u>, 952 A.2d at 504; <u>see also</u>
<u>Armstrong v. Burdette Tomlin Mem. Hosp.</u>, 438 F.3d 240, 246 (3d
Cir. 2006); <u>Linton v. L'Oreal USA</u>, 2009 WL 838766, at *3 (D.N.J.
Mar. 27, 2009). Once a request for accommodation is made, both
parties have a duty to assist in the search for an appropriate
reasonable accommodation. <u>Tynan</u>, 798 A.2d at 657.

Plaintiff argues that Defendant's refusal to excuse her
April 17, 2011 absence, which resulted in her termination,
supports a failure to accommodate claim in violation of the
NJLAD. (Pl. Br. 25-26.) Defendant contends that Plaintiff cannot
satisfy the second prong of the prima face case because the
doctor's note she submitted to excuse her absence failed to give
sufficient notice that she was requesting an accommodation.
(Def. Br. 28.)[9]

New Jersey law places the duty on the employee to initiate
a request for an accommodation. Although there is no specific
formula and the request need not formally invoke the magic words
"reasonable accommodation," the plaintiff must "nonetheless make

---

[9] Defendant does not contest the other elements but argues
fundamentally that Plaintiff requested no "accommodation" for
her condition.

clear that the employee wants assistance for his or her disability." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999); see also Armstrong, 438 F.3d at 247 (noting that employee requested accommodation when she "made her handicap known and announced her desire for assistance"); Tynan, 798 A.2d at 656-67 (noting that while an employee may use "plain English and need not mention the ADA or any other legal source requiring accommodation," she must "'make clear'" that assistance is desired for her disability) (quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)).

Linton v. L'Oreal USA, 2009 WL 838766 (D.N.J. Mar. 27, 2009) provides some insight into what constitutes a sufficient request for an accommodation. In that case, the plaintiff missed several months of work due to a sprained ankle and provided his employer with several doctor's notes during those months stating that the plaintiff must stay on leave. Plaintiff was fired after he used up all his leave under the FMLA, even though he had provided a doctor's note stating that he could not return to work until a week after his leave was set to run out. 2009 WL 838766, at *1-2. The Court held that the doctor's note did not constitute a request for accommodation because it asked for nothing more than to excuse Plaintiff from work. Citing Tynan and Taylor's requirement that a plaintiff must "make clear" that

assistance was being requested, the Court concluded that "[s]omething more is required of an employee . . . than merely apprising her employer that she is still injured to start the interactive process for seeking an accommodation; the employee must arguably seek assistance to survive summary judgment." Linton, 2009 WL 838766, at *6.

Plaintiff asks the Court to find that the April 17th note constituted a request for accommodation, but the Court finds Linton persuasive. Plaintiff's physician's note asked only to excuse Plaintiff's absence from work on April 17th for "arrhythmia," but it made no express or implied request on Plaintiff's behalf for an accommodation under which Plaintiff might perform her job on that day. Nothing in the note suggests that Plaintiff was asking for assistance from her employer because of her disability. The purpose of the physician's note was not to notify her employer that she could no longer perform her job and to request a modification of her duties; instead, it can only be interpreted as seeking an excused absence for a day of work that she had already missed.

Plaintiff cites to Boles v. Wal-Mart Stores, Inc., 2014 WL 1266216 (D.N.J. Mar. 26, 2014), but that case provides further support that a physician's note of this type does not constitute a request for accommodation. In Boles, the plaintiff submitted

49

paperwork requesting medical leave until the end of September
and the employer granted the plaintiff's leave request. The
plaintiff also submitted a doctor's certification stating that
the plaintiff could not return to work until October or
November. The defendant employer fired the plaintiff at the end
of September without warning because that was the period covered
by the plaintiff's leave request. Id., at *4-6. Citing and
following Linton, the Boles court specifically held that the
doctor's certification was insufficient to show that the
plaintiff requested an accommodation, because it "[did] not make
any explicit or implicit request for an accommodation." Id. at
*14. The Court granted summary judgment on the defendant's
failure to accommodate claim because "[d]efendant's obligation
to engage in the interactive process was never triggered." Id.
at 15.

For similar reasons, the Court finds that the physician's
note did not make clear that Plaintiff wanted assistance for her
disability. Because Plaintiff has pointed to nothing else in the
record to suggest that she requested an accommodation, the Court
will grant summary judgment on Defendant's failure to
accommodate claim.

> **3. Summary judgment is warranted on Plaintiff's
>    retaliation claim based on Defendant's failure to
>    accommodate.**

Plaintiff argues that Defendant terminated her because she requested a reasonable accommodation, which also constitutes retaliation under the NJLAD. Retaliation claims under the NJLAD are analyzed under the same burden-shifting framework used for claims under the FMLA or Title VII. See Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 70 (3d Cir. 1996); Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 534-35 (D.N.J. 2008); Anderson v. Exxon Co., 89 N.J. 483, 446 (1982). To establish a prima facie case, Plaintiff must demonstrate by a preponderance of the evidence that (1) she engaged in protected activity — here, a request for a reasonable accommodation; (2) she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action.

Plaintiff's theory is that Defendant fired her "in retaliation for having requested an accommodation" "to take a day off of work for her medical conditions." (Pl. Br. 25-26.) But as the Court has already explained, the evidence is insufficient as a matter of law to show that Plaintiff's physician's note retroactively excusing her from work for a single day constituted a request for assistance for her disability. Plaintiff has not proffered evidence that she was attempting to exercise her right to a reasonable accommodation, nor has she shown that Defendant knew that she was seeking an

accommodation. Because Plaintiff has not shown that she engaged in protected activity, or that Defendant was aware that she engaged in protected activity, the Court will grant summary judgment on this claim.

### 4. Defendant is entitled to summary judgment on Plaintiff's race discrimination claims

A plaintiff alleging race discrimination under the NJLAD[10] must first present evidence sufficient for a prima facie claim of discrimination. She must show that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; (4) under circumstances giving rise to an inference of unlawful discrimination. <u>Jones v. School Dist. of Philadelphia</u>, 198 F.3d 403, 410-11 (3d Cir. 1999); <u>Rogers v. Alternative Resources Corp.</u>, 440 F. Supp. 2d 366, 371 (D.N.J. 2006).

The conduct that appears to form the basis of Plaintiff's discrimination claim may be summarized succinctly. First, Plaintiff states that on April 5, 6, and 8, 2011, approximately two weeks before her termination, she received five patients in isolation units while other nurses received one or two. Second, Kasey Cochrane, a former nurse's aide at Shore, testified that Plaintiff received harder assignments and would be blamed

---

[10] Plaintiff asserts no claim of racial discrimination under Title VII of the Civil Rights Act of 1964.

whenever anything was wrong "because [Plaintiff is] black."
Third, Plaintiff testified that two of her co-workers told her
that she received less desirable assignments because she was
black. Fourth, Plaintiff's co-workers referred to an African
American patient as a "really big stinky black guy" rather than
just a "stinky guy." Fifth, Guerrieri once accused Plaintiff of
playing the "race card." Finally, Plaintiff complained about the
treatment and was promised sensitivity training but the training
was never held. (Pl. Br. 28-29.)

On this evidence, Plaintiff argues – with no citations
whatsoever – that that she was subject to a hostile work
environment, treated less favorably than others, and fired due
to her race. (Pl. Br. 27-30.)

The Court will grant summary judgment in favor of
defendant. First, with respect to a hostile work environment
claim, the evidence fails to establish that Plaintiff's
discrimination was pervasive and regular or sufficiently severe.
Plaintiff cites to a single instance in which she was offended
by a statement her co-workers made about a patient, and to one
comment made by Guerrieri. The "sine qua non of a hostile work
environment claim is a 'workplace ... permeated with
discriminatory intimidation, ridicule, and insult, that is
sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment.'"
McKinnon v. Gonzales, 642 F.Supp.2d 410, 421 (D.N.J. 2009)
(quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116
(2002)). The conduct "must be extreme to amount to a change in
the terms and conditions of employment." Faragher v. City of
Boca Raton, 524 U.S. 775, 788 (1998). It is clear that two
comments over the course of six years of employment does not
rise to the level of regularity, severity, or pervasiveness
required for a hostile work environment claim. See Manley v.
Mem'l Hosp. of Salem, 2012 WL 32926, at *2 (D.N.J. Jan. 5, 2012)
(rejecting hostile work environment claim where plaintiff failed
to specify details of how employer isolated her from other
workers, used racial slurs, and assigned her to less favorable
work shifts and assignments).

Similarly, the evidence does not support a disparate
treatment claim because Plaintiff has not shown that her heavier
workloads rise to the level of an "adverse employment action,"
nor has she established that the assignments were due to her
race. The Third Circuit defines an "adverse employment action"
as "a significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly
different responsibilities, or a decision causing a significant
change in benefits." Durham Life Ins. Co. v. Evans, 166 F.3d

139, 152-53 (3d Cir. 1999) (quoting <u>Burlington Industries, Inc.</u> <u>v. Ellerth</u>, 524 U.S. 742, 761 (1998)). In other words, "[i]f an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." <u>Id.</u> at 153.

Plaintiff points only to three specific incidences over the course of six years of employment at Shore where she received more difficult assignments, and those heavy assignments all occurred within a single week in April. Such conduct does not establish adverse employment action. <u>See</u> <u>Cortes v. Univ. of</u> <u>Medicine and Dentistry of New Jersey</u>, 391 F. Supp. 2d 298, 312 (D.N.J. 2005) ("Not everything that makes an employee unhappy qualifies as [an adverse employment action], for [o]therwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." (internal quotations and citation omitted)); <u>see also</u> <u>Ivan v. Cnty. of Middlesex</u>, 595 F. Supp. 2d 425, 471 (D.N.J. 2009) (adverse employment action must be "serious and tangible enough to materially alter" the terms of plaintiff's employment or adversely affect her employment status). Plaintiff does not allege that caring for more challenging patients was beyond her normal job duties, nor does she allege that she was assigned such patients in order to set

her up to fail. Indeed, Defendant has not alleged that she was deficient in rendering patient care as a basis for her termination. Moreover, although Plaintiff and Cochrane both opined that Plaintiff received more difficult assignments because she was black, discovery in this case has concluded and there are no facts in the record to suggest that this was more than mere conjecture. See Marreo v. Camden Cnty. Bd. of Social Services, 164 F. Supp. 2d 455, 476 (D.N.J. 2001).

Finally, no reasonable jury could find from the evidence that Plaintiff was fired because of her race. The fact that Plaintiff made complaints of race discrimination to Guerrieri and Beatty, who later participated in the decision to fire her does not raise an inference of discriminatory firing. Plaintiff does not specify when she spoke to Guerrieri, and her complaint to Beatty was sometime in 2010, a year before she was actually terminated. Nor is Cochrane's personal belief that Plaintiff was discriminated against persuasive, as it is an unsupported opinion which makes no causal link to Plaintiff's termination. Indeed, Plaintiff's main examples of discriminatory comments or conduct come from co-worker statements, not Guerrieri, Beatty, or any other supervisor with input into firing. Plaintiff has failed to produce sufficient evidence to establish the fourth element of her prima facie burden, namely that these

circumstances give rise to an inference of unlawful

discrimination as required by New Jersey law under the NJLAD.

**V.  CONCLUSION**

For the foregoing reasons, Defendant's motion for summary

judgment will be denied with respect to the FMLA interference

and retaliation claims arising out of Plaintiff's termination

(Counts One and Two). Summary judgment will also be denied with

respect to Plaintiff's NJLAD claim of wrongful termination based

on her disability (Count Three). The Court will grant

Defendant's motion with respect to all other claims (Counts

Four, Five, and Six). The accompanying Order will be entered.


**March 12, 2015**                               **s/ Jerome B. Simandle**
Date                                             JEROME B. SIMANDLE
                                                 Chief U.S. District Judge


57